UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
..........................................................................X

CAROLINE RODRIGUEZ

                Plaintiff,

       - against -

THE NEW YORK FOUNDLING, and
THELMA HARDAMAN, *individually*

             Defendants.
..........................................................................X

Case No.

**COMPLAINT**

**PLAINTIFF DEMANDS A
TRIAL BY JURY**

## COMPLAINT

    Plaintiff Caroline Rodriguez ("Plaintiff" or "Ms. Rodriguez"), by her attorneys, FILIPPATOS PLLC, hereby complains of Defendants, upon personal knowledge, as well as information and belief, by alleging and averring as follows:

### NATURE OF THE CASE

1. This is a case of discrimination and retaliation based on pregnancy, perceived disability (pregnancy-related symptoms and complications), and protected leave status, as well as wage theft, by the New York Foundling, against Plaintiff, a highly skilled and experienced female Data Quality professional.

2. Plaintiff brings this action alleging that Defendant has violated the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 et seq. ("FMLA"), as amended by the Families First Coronavirus Response Act of 2020, Pub. L. No. §§ 116-127 ("FFCRA"); the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA"); New York Labor Law §§ 232, *et seq.*, and §§ 650, *et seq.* ("NYLL"); the Codes, Rules, and Regulations of the State of New York,

hereinafter referred to as the "Additional rate for split shift and spread of hours Order" as codified at N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4, *et seq.* ("NYCRR"); the New York State Human Rights Law, New York State Executive Law, §§ 296, et seq. ("NYSHRL"); and the New York City Human Rights Law, Administrative Code §§ 8-107, *et seq.*, ("NYCHRL").

3.  Prior to the filing of this action, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Contemporaneous with the filing of this action, Plaintiff has filed/will file an Amended Charge of Discrimination with the EEOC, and, when appropriate, will seek a Notice of Right to Sue; thereafter, Plaintiff intends to amend this action to assert corollary claims for gender/sex discrimination, national origin discrimination, disability discrimination, and retaliation, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, ("Title VII"), and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325 ("ADAA").

## JURISDICTION AND VENUE

4.  Jurisdiction of this Court is proper under 29 U.S.C. §§ 2617 and 28 U.S.C. §§ 1331.

5.  The Court has supplemental jurisdiction over the claim that Plaintiff has brought under New York law pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as Defendant resides within the Southern District of New York for a substantial part of the acts complained of herein occurred therein.

## PARTIES

7. At all times relevant hereto, Plaintiff has been a resident of the State and County of Queens.

8. At all times relevant hereto, Defendant NEW YORK FOUNDLING ("Defendant" or "the Company") was and is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of, the laws of the State of New York and maintains its principal place of business at 590 Avenue of the Americas, New York, New York 10011.

9. Defendant NEW YORK FOUNDLING is a child welfare agency which maintains approximately eleven (11) offices in New York City and surrounding counties, and, upon information and belief, employs over fifty (50) individuals on a full-time or full-time equivalent basis, and thus is subject to all statutes upon which Plaintiff is proceeding herein.

10. At all times relevant hereto, Plaintiff was and is an employee of Defendant NEW YORK FOUNDLING.

11. At all times relevant hereto, Defendant THELMA HARDAMAN ("Defendant" or "HARDAMAN") is and has been a resident of New York and held the position of Data Quality Manager with the Company, and as such has had the power and authority to materially impact and affect the terms and conditions of Plaintiff's employment.

3

12. The defendants recited separately immediately hereinabove are sometimes referred to collectively as "Defendants" hereinbelow.

## **MATERIAL FACTS**

### *Plaintiff's Employment with Defendant*

13. Defendant NEW YORK FOUNDLING hired Plaintiff as a Data Quality Analyst on or about June 12, 2019. Upon the commencement of her employment, Plaintiff assumed significant responsibility for performing data entry on a variety of client records with information related to intakes, demographics, movements, medical records, educational records and case openings/closings/transfers, enrollment into Health Homes and SP-Mental Health, as well as processing case action forms documenting worker changes, worker codes, discharge resources, vacation, and hospital, suspend pay. Plaintiff also provides support to program staff on data entry, reporting and data interpretation and works closely with program teams and VP's to ensure accuracy of data, while, protecting the confidentiality of all client case and medical data in accordance with relevant laws, internal procedures, external regulations, and best practice.

14. Specifically, Plaintiff was hired by Genesis Cevallos ("Ms. Cevallos"), HR Generalist for the position of Data Quality Analyst at an annual salary of $40,000.

15. Over approximately the first few months of her tenure at NEW YORK FOUNDLING Plaintiff enjoyed unparalleled success. However, even though Plaintiff achieved positive performance reviews and as many as eight (8) discretionary "BHAG" ("Big Hairy Audacious Goal") awards

4

– which are awarded by supervisory staff for "#GoodIdeas," "#Exceeds," "#PersonalWin," "#PromotingHappiness," "#Teamwork," and "#Volunteering," – during her approximately two years at the Company, Defendant NEW YORK FOUNDLING has failed to pay Plaintiff any discretionary bonus. Upon information and belief, Defendant NEW YORK FOUNDLING has paid Plaintiff's similarly situated, non-pregnant colleagues such discretionary bonuses.

***After Engaging in Protected Activity, Plaintiff Was Subjected to a Torrent of Discriminatory and Retaliatory Conduct by Defendants HARDAMAN and NEW YORK FOUNDLING***

16. In 2019, Plaintiff reported directly to Defendant HARDAMAN, who held the position of Data Quality Manager.

17. Defendants HARDAMAN and NEW YORK FOUNDLING became aware of Plaintiff's pregnancy in 2019.

18. On August 8, 2019, Plaintiff texted Defendant HARDAMAN stating that she was in danger of having a miscarriage, to which Defendant HARDAMAN callously responded: "Wow, I thought so. I told … [a co-worker] I hope she is not pregnant and having a possible miscarriage." Later that day, Plaintiff's doctor advised her to go home and rest, immediately. Indeed, over the next few days, Plaintiff had to get a full prenatal blood panel done, as well as an ultrasound, to diagnose why she was at high-risk of a miscarriage. Shortly thereafter, on August 12, 2019, Defendant HARDAMAN became upset that Plaintiff had missed two workdays due to the complications with her pregnancy. In fact, Defendant HARDAMAN threateningly stated to Plaintiff, that "this could become a problem."

19. In a supervisory meeting sometime during the following week of August 19, 2019, Defendant HARDAMAN restated to Plaintiff that she was unhappy with the number of days Plaintiff had missed in August because of her high-risk pregnancy. Defendant HARDAMAN also complained that Plaintiff was always leaving her seat to go to the bathroom. Plaintiff tried to explain that, in her pregnant state, she had severe back pain from sitting down at her desk and that her kidneys would start to hurt if she did not go to the bathroom frequently.

20. Shockingly, Defendant HARDAMAN replied: "if that's the case, then you're telling me that it hurts you to work." Defendant HARDAMAN further stated that she cannot have "sick employees" working for her and that "sick employees" were "of no use" to her. Adding insult to injury, Defendant HARDAMAN then advised Plaintiff that she should "quit" her position at the New York Foundling and find a part-time job because that would be "a better fit" for her as a pregnant woman.

21. Instead of affording Plaintiff the necessary reasonable accommodation for her to continue to do her job with a high-risk pregnancy, Defendant HARDAMAN discriminatorily decreed that Plaintiff could neither use the bathroom frequently, nor eat while at work, because she was "a distraction to the rest of the team." In addition, Defendant HARDAMAN stated that it did not matter that Plaintiff was pregnant, because "you're not the first pregnant woman that has worked for me."   Defendant HARDAMAN concluded the meeting by ominously mentioning that she had met with Erick Nicklas ("Mr. Nicklas"), Vice President of Quality Assurance, to

confer on grounds to terminate Plaintiff, as well as how to involve Human Resources ("HR") to "make sure the termination would stick." Understandably, Plaintiff became nervous and distraught because of Defendant HARDAMAN's malicious statements and conduct.

22. Sometime in late August or early September 2019, Plaintiff was informed by her co- workers that recently, on a day when Plaintiff was not in the office, Defendant HARDAMAN cruelly joked with her co-workers about Plaintiff's symptomatic bleeding, stating, "yeah, haha, you should have seen … [Plaintiff] was sitting at her desk bleeding, not knowing what was happening, haha." Later, when she saw Plaintiff, Defendant HARDAMAN acted surprised that Plaintiff was still pregnant, mockingly stating "I didn't know you were still pregnant." Plaintiff replied that she was and had not lost the baby. This incident further contributed to Plaintiff's emotional distress.

23. During a last-minute meeting on October 1, 2019, Defendant HARDAMAN kept asking Plaintiff why Plaintiff needed to drink so much water and accused Plaintiff of getting up to socialize with co-workers, not to drink water because she was dehydrated from her high-risk pregnancy. In this meeting, Defendant HARDAMAN also stated that Plaintiff's probationary period was being extended to six months from three months, and threatened Plaintiff that she could still be terminated for "poor performance" because she was taking "too much time off" for doctor's appointments and other pregnancy-related responsibilities.

24. Increasingly upset, on October 28, 2019, Plaintiff met with Ryan Rattighan ("Mr. Rattighan"), Human Resources ("HR") Business Partner, and Ashley Martinez ("Ms. Martinez"), HR Coordinator. Plaintiff called this meeting with HR as she was worried about Defendant HARDAMAN's statement that her probationary period had been changed to six months because of the sick days Plaintiff had requested for doctor's visits related to her high-risk pregnancy. Both Mr. Rattighan and Ms. Martinez were surprised to hear about Plaintiff's concerns and re-assured her that her probationary period had indeed already expired in September 2019. While Mr. Rattighan and Ms. Martinez stated they would investigate Plaintiff's concerns and get back to her in a timely manner, Plaintiff heard nothing further from either Mr. Rattighan or Ms. Martinez.

25. Then, on or about November 25, 2019, to further torture Plaintiff, Defendant HARDAMAN mandated that Plaintiff attend an off-site training, forcing Plaintiff to walk twelve long blocks to the train station while in pain from her high-risk pregnancy, which was now ending the second trimester. Knowing that it was a long walk from attending previous years, Plaintiff's co-workers helped her walk slowly to the training location.

26. Unfortunately, on January 24, 2020, Plaintiff's work environment deteriorated even further into pure hostility when Defendant HARDAMAN demanded that Plaintiff immediately share her passwords with her. In a loud voice, so that all her co-workers could hear, Defendant

HARDAMAN pointed at Plaintiff and stated, offensively, "she looks like she's about to pop, so I need the passwords to her computer to access her documents on the database."

27. Plaintiff politely responded that she would provide her passwords to Defendant HARDAMAN shortly, after she completed the important task she was currently working on. Defendant HARDAMAN then became irate when she overheard a co-worker, Venessa Jael ("Ms. Jael"), IT Professional, advise Plaintiff in a whisper not to give Defendant HARDAMAN her passwords. Enraged, Defendant HARDAMAN turned around in her chair to face Plaintiff and Ms. Jael, and repeatedly stated in a loud and menacing voice: "What did you say?" Defendant HARDAMAN then stood up and aggressively walked towards Plaintiff. Once again, Plaintiff calmly informed Defendant HARDAMAN that she would give her the passwords as soon as she finished the report she had started.

28. At this point, Defendant HARDAMAN began threateningly roaming around the narrow room, while yelling at Plaintiff and Ms. Jael. To diffuse the tense situation, another co-worker, Nilda Figueroa ("Ms. Figueroa"), also intervened, but circumstances continued to worsen: still trying to de-escalate the brewing conflict, at one point, Plaintiff respectfully asked Defendant HARDAMAN if they could address matters in an appropriate and civil manner.

29. In response, Defendant HARDAMAN screamed at Plaintiff to "shut up!" and stormed towards her again in a threatening manner. Shockingly, Ms. Jael had to protect Plaintiff from Defendant HARDAMAN's menacing advance by standing in between them; nevertheless, Plaintiff felt

9

incredibly uncomfortable and feared that Defendant HARDAMAN was going to harm her and her unborn child. Defendant HARDAMAN continued to yell at Plaintiff, Ms. Jael, and Ms. Figueroa, stating: "I'm the boss here! You do as I say!"

30. Frighteningly, Defendant HARDAMAN kept trying to instigate a physical fight with Plaintiff, a woman in the sixth month of a high-risk pregnancy – by saying "step outside with me right now -- let's go!" Plaintiff repeatedly responded that she was not going anywhere with Defendant HARDAMAN, but Defendant HARDAMAN kept demanding that Plaintiff get up from her seat and follow her. Plaintiff could not even walk two blocks at that time, had trouble breathing, could feel the baby moving around frantically in her womb, and was in severe pain. Incredibly, this incident lasted for about an hour before Defendant HARDAMAN finally cooled down and left the room. Needless to state, the physical and emotional toll of the "passwords incident" on Plaintiff was devastating. Shaken, Plaintiff went to HR directly after the passwords incident and explained what had happened to Mr. Rattighan and Ms. Martinez.

31. Specifically, she told them how Defendant HARDAMAN had turned hostile against her after demanding Plaintiff's passwords "immediately," and Plaintiff's reply that she would indeed provide them "shortly." During this conversation, Mr. Rattighan admitted outright that Defendant HARDAMAN's actions were discriminatory and that "***this is a big lawsuit, but don't say that I told you this***."

32. Both Mr. Rattighan and Ms. Martinez became worried about Plaintiff as she was obviously in an awful state -- both emotionally and physically. They told Plaintiff that the situation with Defendant HARDAMAN was "definitely concerning"; Plaintiff responded that she feared for her baby's life because she has trouble breathing and could feel her baby moving around uncomfortably. Nevertheless, instead of providing Plaintiff with an effective and immediate solution, Mr. Rattighan and Ms. Martinez nonchalantly responded that they would interview people who were present at the time of the passwords incident and could, perhaps, try mediation between Defendant HARDAMAN and Plaintiff. Unbelievably, nothing more happened, however, before Plaintiff went on medical leave for her high-risk pregnancy on February 3, 2020.

33. After her inconclusive discussion with Mr. Rattighan and Ms. Martinez, Plaintiff also went to speak to VP of Quality Assurance Mr. Nicklas about the horrific passwords incident she had experienced with Defendant HARDAMAN. Mr. Nicklas, however, refused to engage in any discussion with Plaintiff and initially did not even acknowledge her coming into his office. When he eventually did acknowledge her, Plaintiff explained to Mr. Nicklas that she almost had a physical confrontation with Mr. Hardaman through no fault of her own; Mr. Nicklas responded dismissively that he was not there, so "it has nothing to do with me."

34. Mr. Nicklas added that Plaintiff "could say anything happened." Ultimately, Mr. Nicklas informed Plaintiff that he was handing the matter over to HR. Plaintiff then asked Mr. Nicklas

about moving her workstation, and Mr. Nicklas replied bureaucratically that such a request needed to be submitted in writing, and that "it could take a while."

35. On January 28, 2020, still not having heard anything remedial, Plaintiff sent an email to HR and Mr. Nicklas again requesting a change of workstation because she was concerned for her safety given Defendant HARDAMAN's hostile, volatile, discriminatory, and retaliatory behavior. In this email, Plaintiff stated that she did not feel comfortable "with what transpired on Friday evening." In addition, she wrote: "I have to take into consideration my health, safety and well-being. I will be giving birth in a couple of days and I cannot afford to have anything happen to myself or the baby."

36. On January 30, 2020, the day before she went out on maternity leave, Plaintiff sent an email to HR detailing her side of the story and expressing her concern that although the highly serious incident happened on January 24, 2020, and she had reported it immediately, no one from HR had yet contacted her to discuss. Mr. Nicklas flippantly responded: "Well, sometimes we have to do things we don't like." Mr. Nicklas then refused to listen to Plaintiff any further and kept interrupting her to state that she "had to follow the chain of command."

37. Plaintiff tried to explain that "this environment is dangerous for me to work in" to which Mr. Nicklas dismissively replied: "that's up to me to decide" and then stated, "I trust Defendant HARDAMAN's word over anyone's word." Plaintiff then went on maternity leave from February 3, 2020, through May 26, 2020.

38. To add insult to injury, Plaintiff was also denied disability leave by Defendant in March of 2020.

***Further Discriminatory and Retaliatory Conduct by Defendants HARDAMAN and NEW YORK FOUNDLING, Including Wage Theft, Based on Plaintiff's Gender; Disability; Protected Leave; and Former Complaint of Discrimination***

39. On May 26, 2020, Defendant HARDAMAN contacted Plaintiff and stated that she would be required to go into the office after returning from maternity leave because her co-workers were doing so, notwithstanding the ongoing COVID-19 pandemic. Shortly thereafter, Plaintiff spoke to Ms. Martinez, who asked her if she would like to resolve her ongoing issues with Defendant HARDAMAN "directly," to which Plaintiff replied that she needed the assistance of HR to do so. Ms. Martinez then stated that Plaintiff had the opportunity to seek "special accommodation," and Plaintiff responded that she would be interested in doing so. Ms. Martinez forwarded the paperwork regarding accommodations to Plaintiff a few days later, and Plaintiff promptly filled it out and sent it back to Defendant NEW YORK FOUNDLING. Unfortunately, Plaintiff never heard back from HR regarding her application for reasonable accommodations.

40. Indeed, even after she returned to work from maternity leave, Plaintiff heard nothing about the passwords incident for months. Shockingly, on July 14, 2020, Plaintiff finally received a communication regarding the incident in the form of a Corrective Discipline Report ("CDR"), which was tantamount to a written warning. To her utter dismay, this corrective action was

13

directed at her (the victim) instead of Defendant HARDAMAN, the clear perpetrator of the wrongful and discriminatory conduct. Following this, on July 17, 2020, Plaintiff was summoned to a teleconference with Mr. Rattighan and Mr. Nicklas in connection with the passwords incident.

41. Troublingly, Mr. Rattighan and Mr. Nicklas did not mention that Defendant had disciplined, or was planning to discipline, Defendant HARDAMAN for her unlawful and discriminatory behavior.

42. As a result of the CDR, a false, discriminatory, and retaliatory written warning was issued to Plaintiff, which, in part, stated as follows: "[Defendant HARDAMAN] approached [Plaintiff] in regards to obtaining [Plaintiff's] password/s, given that her maternity leave was scheduled to start within the next few days. [Defendant HARDAMAN] requested [Plaintiff's] password early incase [Plaintiff's] leave started earlier than anticipated as [Defendant HARDAMAN] wanted to ensure that she had the means necessary to access [Plaintiff's] work while she was on leave, if necessary. The request was met with tension as [Plaintiff] was hesitant to give her password to [Defendant HARDAMAN] and felt uncomfortable with the request. As a result, the conversation turned hostile with both [Defendant HARDAMAN] and [Plaintiff] raising their voices in an aggressive manner. This interaction was witnessed by multiple employees and in turn made many of the employees in the room feel very uncomfortable and created a hostile work environment."

14

43. The written warning erroneously concluded that Plaintiff committed violations of the standard of conduct as described in The New York Foundling's Standards of Professional Conduct (pages 53-54 of the Employee Handbook) – i.e., any violation of the New York Foundling's Code of Ethics or its Corporate Compliance Code of Conduct; or any act (whether verbal or physical) that threatens, coerces, or endangers the safety of clients, visitors, or other employees.

44. Plaintiff responded as follows under the "Employee Comments" section of the written warning: "I am not in agreement with the information listed above. Due to my pregnancy, I have experienced discrimination and harassment throughout my time at The New York Foundling." To Plaintiff's knowledge, no investigation was ever conducted by HR with respect to her concerns of discrimination and retaliation.

45. Within weeks of this false, discriminatory, and retaliatory written warning, and without regard to the law, on August 8, 2020, Plaintiff received a vindictive and inaccurate Performance Assessment ("PA") from Defendant HARDAMAN, which included the flagrantly unlawful admissions that Plaintiff (a) had trouble with time and attendance due to her pregnancy, and (b) was regularly required to work uncompensated overtime.

46. Then, on or about September 4, 2020, Defendant HARDAMAN repeated her discriminatory statement that Plaintiff "should take time off" because of her high-risk pregnancy. Later in September 2020, at another team meeting, Defendant HARDAMAN accused Plaintiff of

15

"pretending to be sick." Thankfully, on February 13, 2020, despite everything, Plaintiff successfully gave birth to her son, Leonardo Lleshi.

47. On September 30, 2020, Plaintiff entered certain sick days on the schedule that Defendant HARDAMAN had previously approved. Shockingly, shortly thereafter, Defendant HARDAMAN wrote to HR complaining that Plaintiff had requested time off just after coming back from maternity leave.

48. On October 21, 2020, during a team meeting, Defendant HARDAMAN became angry with Plaintiff over an education report that Plaintiff had prepared, and sent an email to the whole team, including Plaintiff, calling the report "horrible" and demanding that everyone immediately turn their cameras on to work on the report.

49. Thus, Defendant HARDAMAN not only embarrassed and humiliated Plaintiff in front of her co- workers, but knowingly treated Plaintiff unfairly due to her pregnancy, as Defendant HARDAMAN knew full-well that Plaintiff had been away from the office for much of the time period in question, due to her protected maternity leave.

50. On December 1, 2020, Plaintiff yet again raised concerns to Mr. Rattighan about Defendant HARDAMAN's continued discrimination and retaliation against her. Plaintiff stated to Mr. Rattighan that Defendant HARDAMAN continues to set up obstacles to cause Plaintiff's failure instead of giving her the tools necessary for her to succeed.

51. In addition, Plaintiff told Mr. Rattighan that Defendant HARDAMAN continued to unfairly overload her with work. At one point, Plaintiff explained to Mr. Rattighan, that she was carrying the workload of three co-workers, plus her own, as Defendant HARDAMAN had allowed her co- workers to go on long-term leave or vacation without planning to replace them temporarily. Moreover, while her co-workers' time off had all been approved by Defendant HARDAMAN, Plaintiff's had not.

52. Instead, Plaintiff's 35-hour work week mushroomed to over 50 hours per week in October, November, and December 2020, which resulted in Plaintiff working approximately 36 hours of overtime for which she was unlawfully paid nothing. Specifically, from in or about October through the end of December 2020, Plaintiff was forced to work over 50 hours per week, providing coverage for two colleagues, whom Defendant HARDAMAN had allowed to go on long-term leave or vacation without planning to replace them temporarily, while forcing Plaintiff to perform their work.

53. Plaintiff, who is an hourly employee, nevertheless was not paid overtime for the excessive hours she worked; moreover, when Mr. Rattighan became aware of this situation, he did not provide a retroactive remedy to address the wage theft that had occurred.

54. Plaintiff further stated to Mr. Rattighan that Defendant HARDAMAN would systematically ignore Plaintiff's emails requesting help and information, leaving Plaintiff overworked and ill-informed, which caused Plaintiff to miss certain deadlines. Distraught, Plaintiff expressed to

17

Mr. Rattighan that she felt she was in a vicious cycle where Defendant HARDAMAN would make it impossible for her to perform her work and then criticize her for not getting it done. Plaintiff also expressed her concern to Mr. Rattighan that Defendant HARDAMAN had repeatedly told Plaintiff that she should quit her job and threatened to get Plaintiff fired. Finally, Plaintiff informed Mr. Rattighan that this hostile work environment was causing her stress level to become dangerously elevated, which, of course, negatively impacted her and her baby's health.

55. In response, Mr. Rattighan stated that a plan would be put in place to address the toxicity between Defendant HARDAMAN and Plaintiff; however, Plaintiff did not hear from Mr. Rattighan again until months later, in February 2021 when he left her voicemail apologizing that he had been too busy to respond sooner and asking her to meet with him. Meanwhile, nothing had changed in the interim -- the discrimination and retaliation against Plaintiff continued unabated.

56. On January 6, 2021, Plaintiff held yet another meeting with Mr. Rattighan to report that Defendant HARDAMAN was continuing to discriminate and retaliate against her by demanding that Plaintiff begin going back into the office, despite the office being functionally closed due to the ongoing COVID-19 pandemic, and although none of her work – all of which was being accomplished remotely – required her to do so. Moreover, no one else on the team, including Defendant HARDAMAN, was going into the office at that time.

57. In response, Mr. Rattighan directed Plaintiff not to go into the office until Defendant NEW YORK FOUNDLING addressed her pending request for a reasonable accommodation or protected pandemic-related intermittent leave. Mr. Rattighan stated that he would speak to Plaintiff and Defendant HARDAMAN separately before suggesting to both that they should "mediate" their differences. Finally, Mr. Rattighan assured Plaintiff that he would get back to her in a timely manner with concrete plans regarding the proposed mediation and her ability to continue to work remotely.

58. Shortly thereafter, Plaintiff had a meeting with Defendant HARDAMAN, who again demanded that Plaintiff (a) go into the office on Fridays, and (b) report to Defendant HARDAMAN whenever Plaintiff went into the office. Even to date, however, Plaintiff has not heard back from HR to reconcile the conflicting instructions.

59. On Friday, November 20, 2020, Defendant HARDAMAN engaged in yet more discriminatory and retaliatory conduct when she singled out Plaintiff from the rest of her team and demanded that Plaintiff go into the office to process fingerprints after work hours. At around 4:00pm, that day, Defendant HARDAMAN harassingly followed up with Plaintiff insisting that Plaintiff go into the office at once to complete the fingerprint processing.

60. Consequently, Plaintiff was forced to take her newborn baby and toddler with her to the office, while the COVID-19 pandemic was at its peak, in order to process fingerprints that could certainly have waited until Monday. Plaintiff stayed at the office needlessly processing

fingerprints until approximately 7:00pm, when she had to leave and go nurse her crying and hungry newborn in the family car. Plaintiff then returned home with her family and continued processing the fingerprints until approximately 9:00pm, when she finally finished.

61. On January 25, 2021, at the behest of Ms. Martinez, Plaintiff filed a so-called "reasonable accommodation request," to be allowed to continue working remotely until her baby – now nine months old – was old enough to go to daycare safely and her older daughter – now four years old – was able to return to school for in-person learning. With this request, Plaintiff also asked several questions about the eligibility for this type of leave or permission, as well as whether the internal mediation with Defendant HARDAMAN was going forward. Again, in what has become a troubling pattern of being stonewalled, Plaintiff never received a substantive response from HR regarding her requests.

***Plaintiff's Formal Complaints Regarding Defendant HARDAMAN's Unlawful Conduct Are Ignored by Defendant NEW YORK FOUNDLING, as the Onslaught of Discriminatory and Retaliatory Conduct by Defendant HARDAMAN Against Plaintiff Remains Unabated to this Day***

62. On January 26, 2021, Plaintiff had a telephone conference call with her team members Mr. Negron and Ms. Jael, during which they warned Plaintiff to "be careful" because Defendant HARDAMAN was still trying to get her fired.  In this context, Mr. Negron and Ms. Jael both observed that they had never witnessed Defendant HARDAMAN – with whom they had worked for five and eight years, respectively – dislike somebody as much as she disliked Plaintiff.

63. On, Friday, January 29, 2021, Plaintiff went into the office as directed by Defendant HARDAMAN.  Plaintiff was stopped by someone at the security desk, who proceeded to look up her name, pause, and then called someone named Laurie Ramirez ("Ms. Ramirez"), HR Manager, who ultimately advised the security guard to let Plaintiff through.

64. Plaintiff then went upstairs to see Ms. Ramirez, who, after searching for Plaintiff's name on the Company directory, looked at Plaintiff perplexedly and asked if Plaintiff still worked at The New York Foundling or had been let go.

65. Appalled, Plaintiff immediately responded in the affirmative and explained that she had returned from maternity leave in May 2020. Ms. Ramirez then issued Plaintiff a new Employee ID, which she stated should be "on-line" within 48 hours.

66. When Plaintiff returned to the office on Friday, February 5, 2021, however, her Employee ID was still inoperable. The following Friday, February 12, 2021, Plaintiff's Employee ID still did not work, but she was let in by the security guard at the front desk who recognized her. Though Plaintiff had been working at Defendant NEW YORK FOUNDLING continuously during this period, Plaintiff was not provided with a new working ID until months later, on August 6, 2021.

67. On Friday, August 7, 2021, Mr. Negron stated to Plaintiff: "I can see all of the underhanded things [Defendant HARDAMAN] is trying to do with you and Venessa [Jael] when it comes to certain work-related things."

21

68. On Thursday, August 19, 2021, at approximately 12:50pm, Defendant HARDAMAN sent out a last-minute team meeting invite requiring the whole team, including Plaintiff, meet at 1:00pm sharp. Because Plaintiff was out to lunch, she neither saw the invite nor attended the team meeting. Later that day, Mr. Negron asked Plaintiff if she had emailed Defendant HARDAMAN that morning to let her know that Plaintiff was present in the office, and Plaintiff confirmed to Mr. Negron that she had, indeed, done so by showing him the email she had sent to that effect.

69. Mr. Negron responded that Defendant HARDAMAN discussed Plaintiff missing the 1:00pm meeting in front of the entire team and made a big deal of it by falsely stating: "I don't even know if she was in today because I did not receive an email from her this morning stating she was in the office."

70. On August 26, 2021, Plaintiff injured her foot. Plaintiff emailed Defendant HARDAMAN to notify her of her injury, and that as a result, she would need to work remotely that day.

71. Quite unsympathetically, Defendant HARDAMAN merely responded by telling Plaintiff that she would need to arrange for someone to come into the office on her behalf. Then, on August 30, 2021, Plaintiff's doctor recommended that she stay off her feet for a week, and further advised that she should avoid any strenuous movements for at least a month.

72. Plaintiff forwarded a letter from her doctor to this effect to Defendant HARDAMAN, who oddly responded by telling Plaintiff that she should not log on to her computer. Following

Defendant HARDAMAN's strange order, Mr. Rattighan informed Plaintiff that Defendant HARDAMAN had contacted him and informed her about Plaintiff's foot injury. Mr. Rattighan further stated that Defendant HARDAMAN raised some concerns about Plaintiff's doctor's note and requested clarification on the dates she was requesting. Defendant HARDAMAN's unfounded "concerns" were clearly retaliatory, as there was no reason to scrutinize Plaintiff's request, as she had previously given the relevant information necessary for Defendant NEW YORK FOUNDLING to approve her remote days, as well as a valid doctor's note. Notwithstanding same, Mr. Rattighan requested that Plaintiff fill out a reasonable accommodation form.

73. On September 9, 2021, Defendant HARDAMAN called a last-minute meeting whereby she made numerous discriminatory statements about being a woman, which Plaintiff felt were indirectly aimed at her, causing her to feel extreme embarrassment and humiliation.

74. Specifically, Defendant HARDAMAN told the entire time that "James, you probably won't like her (my laptop), she's a woman, she is too sensitive, she has a sensitivity issue, you have to watch how you handle her. But not your laptop, I bet it is a man, it is rough and you don't have to watch out for how sensitive it is." Defendant HARDAMAN repeated these clearly discriminatory and insensitive comments at least three or four times, again referencing the laptop as a sensitive woman. Defendant HARDAMAN further exclaimed that the team should "watch out because she is sensitive, she's a woman and has problems," again referencing the

laptop, but clearly indicating that she was really talking about something (or someone) else. Following the foregoing discriminatory comments which were evidently aimed at Plaintiff, Defendant HARDAMAN subsequently asked the team questions regarding a project they had all been recently working on.

75. However, every time Plaintiff attempted to answer a question, Defendant HARDAMAN spoke over her and deliberately ignored her responses. To make matters worse, throughout the entire meeting, Plaintiff's colleagues continued to joke and laugh with Defendant HARDAMAN at her jokes about being a woman and having sensitivity issues, which left Plaintiff feeling extremely uncomfortable, targeted, and discriminated against.

76. On September 9, 2021, Plaintiff took her son to see his doctor ("Dr. Chusid"), due to his babysitter raising concerns regarding his development and constant nose bleeds. As a result of the tests that were performed, Dr. Chusid told Plaintiff that her son's hearing was flat lined, and that he was not meeting several of the developmental milestones for children in his age group. Given the foregoing, Dr. Chusid recommended that Leo see an early interventionist and speech therapist.

77. Later that week, Plaintiff had another conversation with Dr. Chusid whereby they spoke about her pregnancy, and Dr. Chusid became concerned that she had been bleeding so much throughout her pregnancy and had extremely high levels of stress. At this point, Dr. Chusid

also suggested that Plaintiff's son see a neurologist for brain scans, because the bleeding in her stomach could have affected his brain development.

78. Based on the foregoing discussion, Defendants have discriminated and retaliated against Plaintiff on the basis of her request for leave accommodation and protected leave status, and have improperly withheld and/or not paid Plaintiff wages she is owed, in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 et seq. ("FMLA"), as amended by the Families First Coronavirus Response Act of 2020, Pub. L. No. §§ 116-127 ("FFCRA"); the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA"); New York Labor Law §§ 232, *et seq.*, and §§ 650, *et seq.* ("NYLL"); the Rules and Regulations of the State of New York, "Additional rate for split shift and spread of hours" order, as codified at N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4, *et seq.* ("NYCRR")*;* the New York State Human Rights Law, New York State Executive Law, §§ 296, et seq. ("NYSHRL"); and the New York City Human Rights Law, Administrative Code §§ 8-107, *et seq.*, ("NYCHRL").

**AS A FIRST CAUSE OF ACTION FOR**
**INTERFERENCE OR RETALIATION UNDER THE FAMILY AND MEDICAL LEAVE**
**ACT**
**(Against Defendant NEW YORK FOUNDLING Only)**

79. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were fully set forth herein at length.

80. Section 2612(a)(D) of the Family Medical Leave Act, states in pertinent part: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period …

25

Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

81. Section 2615(a) of the Family Medical Leave Act, states in pertinent part:

Interference with rights.

(1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

82. Upon information and belief, Plaintiff and Defendant NEW YORK FOUNDLING are subject to the FMLA, respectively, as eligible employee and covered employer.

83. Defendant NEW YORK FOUNDLING interfered with Plaintiff's rights under the FMLA by denying her protected leave after she gave notice of her intention to take a protected leave.

84. Defendant NEW YORK FOUNDLING discriminated and retaliated against Plaintiff for requesting and taking protected leave under the FMLA by discriminating against her in the terms and conditions of her employment and terminating her employment.

85. As such, Plaintiff has been damaged as set forth herein.

## AS A SECOND CAUSE OF ACTION FOR
## VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (Against Defendant NEW YORK FOUNDLING Only)

86. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were fully

set forth herein at length.

87. The Fair Labor Standards Act as codified at 29 U.S. Code § 207 states in pertinent part:

> Except as otherwise provided in this section, no employer shall employ any of
> his employees who in any workweek is engaged…for a workweek longer than forty
> hours unless such employee receives compensation for his employment in excess
> of the hours above specified at a rate not less than one and one-half times the regular
> rate at which he is employed.

88. Upon information and belief, Plaintiff and Defendant NEW YORK FOUNDLING are subject

to the FLSA, respectively, as eligible employee and covered employer.

89. Defendant NEW YORK FOUNDLING interfered with Plaintiff's rights under the FLSA by

denying her proper overtime pay.

90. As such, Plaintiff has been damaged as set forth herein.

## AS A THIRD CAUSE OF ACTION FOR
## VIOLATION OF THE NEW YORK LABOR LAW
### (Against Defendant NEW YORK FOUNDLING Only)

91. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were fully

set forth herein at length.

92. Section 232 of the New York Labor Law, states in pertinent part:

> An employee, employed by a contractor, who works more than eight hours in any
> one day or more than forty hours in any workweek shall be paid wages for such

27

overtime at a rate not less than one-and-one-half times his prevailing basic cash hourly rate.

93. Section 650 of the New York Labor Law, states in pertinent part:

> There are persons employed in some occupations in the state of New York at wages insufficient to provide adequate maintenance for themselves and their families. Such employment impairs the health, efficiency, and well-being of the persons so employed, constitutes unfair competition against other employers and their employees, threatens the stability of industry, reduces the purchasing power of employees, and requires, in many instances, that wages be supplemented by the payment of public moneys for relief or other public and private assistance. Employment of persons at these insufficient rates of pay threatens the health and well-being of the people of this state and injures the overall economy.

94. Upon information and belief, both Plaintiff and Defendant NEW YORK FOUNDLING are subject to the NYLL.

95. Defendant NEW YORK FOUNDLING interfered with Plaintiff's rights under the NYLL by, at the very least, denying her proper overtime pay.

96. As such, Plaintiff has been damaged as set forth herein.

**AS A FOURTH CAUSE OF ACTION FOR**
**VIOLATION OF THE CODES, RULES, AND REGULATIONS OF THE STATE**
**OF NEW YORK**
**(Against Defendant NEW YORK FOUNDLING Only)**

97. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were fully set forth herein at length.

98. Section 142-2.4 of Title 12 of the Codes, Rules, and Regulations of the State of New York states in pertinent part:

28

Employees are entitled to one additional hour of pay for each day (i) worked more than 10 hours and/or (ii) there is a split shift so that the number of hours between the start of the first shift and the end of the last shift exceeds ten

99. Upon information and belief, both Plaintiff and Defendant NEW YORK FOUNDLING are subject to the NYCRR.

100.   Defendant NEW YORK FOUNDLING interfered with Plaintiff's rights under the NYCRR by denying her proper overtime and/or spread of hours pay.

101.   As such, Plaintiff has been damaged as set forth herein.

**AS A FIFTH CAUSE OF ACTION FOR
DISCRIMINATION AND RETALIATION UNDER THE
NEW YORK STATE HUMAN RIGHTS LAW
(Against All Defendants)**

102.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

103.   New York State Executive Law § 296 states in pertinent part:

1(a). It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.
…
7. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified, or assisted in any proceeding under this article.

104.    Defendants engaged in an unlawful discriminatory practice by retaliating against Plaintiff for opposing practices forbidden under the New York State Human Rights Law.

105.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damaged including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

106.    Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**AS A SIXTH CAUSE OF ACTION FOR
AIDING AND ABETTING UNDER THE
NEW YORK STATE HUMAN RIGHTS LAW
<u>(Against Individual Defendant Only)</u>**

107.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of the complaint as if fully set forth herein.

108.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

109.    Defendant HARDAMAN engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct against Plaintiff.

30

110. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures, and other non-pecuniary losses and special damages.

111. Accordingly, as a result of Defendant HARDAMAN's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**AS A SEVENTH CAUSE OF ACTION FOR
DISCRIMINATION AND RETALIATION UNDER THE
NEW YORK CITY HUMAN RIGHTS LAW
(Against All Defendants)**

112. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

113. New York City Administrative Code § 8-107 provides that:

> 1, It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment.
> …
> 7. It shall be unlawful discriminatory practice: For an employer […] to discriminate against any person because such person has opposed any practices forbidden under this chapter […]

31

114.    Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her pregnancy and perceived disability (pregnancy-related symptoms and complications).

115. Defendants engaged in an unlawful discriminatory practice by retaliating against Plaintiff for opposing practices forbidden under the New York City Human Rights Law.

116.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

117.    Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

### AS AN EIGHTH CAUSE OF ACTION FOR AIDING AND ABETTING UNDER THE NEW YORK CITY HUMAN RIGHTS LAW (Against Individual Defendant Only)

118.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

119.    The New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

32

120.    Defendant HARDAMAN engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(6) by aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful and retaliatory conduct.

121.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

122.    Accordingly, as a result of Defendant HARDAMAN's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## JURY DEMAND

123.    Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A.    Declaring that Defendant engaged in unlawful employment practices prohibited by the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq*;, by retaliating against Plaintiff for requesting and receiving protected leave as well as interfering with same;

B.    Declaring that Defendant engaged in unlawful employment practices prohibited by the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA"); New York Labor Law §§ 232, *et seq.*, and §§ 650, *et seq.* ("NYLL"); the Codes, Rules, and Regulations of the State of

New York, hereinafter referred to as the "Additional rate for split shift and spread of hours Order" as codified at N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.4, *et seq.* ("NYCRR"); by denying Plaintiff proper overtime and/or spread of hours pay;

C.   Declaring that Defendant engaged in unlawful employment practices prohibited by the the New York State Human Rights Law, New York State Executive Law, §§ 296, et seq. ("NYSHRL"); and the New York City Human Rights Law, Administrative Code §§ 8-107, *et seq.*, ("NYCHRL"); by discriminating and retaliating against Plaintiff on the basis of her pregnancy and perceived disability (pregnancy-related symptoms and complications);

D.   Awarding damages to the Plaintiff, for all lost wages and benefits resulting from Defendants' discrimination in employment and to otherwise make her whole for any losses suffered as a result of such unlawful employment practice;

E.   Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

F.   Awarding Plaintiff liquidated damages;

G.   Awarding Plaintiff punitive damages;

H.   Awarding Plaintiff pre-judgment and post-judgment interest as applicable;

I.   Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of the action; and

J.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

proper to remedy the Defendant's unlawful employment practices.

Dated: White Plains, New York
        May 25, 2022

Parisis G. Filippatos
**FILIPPATOS PLLC**
Attorney for Plaintiff
199 Main Street, Suite 800
White Plains, NY 10601
Tel: 914-984-1111
Fax: 914-984-1111
pgf@filippatoslaw.com

*/s/ Parisis G. Filippatos*